ORIGINAL

Approved: _____

DANIEL S. NOBLE / DENNIS R. KIHM
Assistant U.S. Attorney / Trial Attorney
Fraud Section, Criminal Division

U.S. DISTRICT COURT
FILED
OCT 1 7 2017
DS
S.D. OF N.Y.

Before:   HONORABLE SARAH NETBURN
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - X
                              :
UNITED STATES OF AMERICA       :
                              :
       - v. -                 :
                              :
ANDREW SIMON,                 :
                              :
            Defendant.         :
                              :
- - - - - - - - - - - - - - - X

# 17 MAG 7717

**SEALED COMPLAINT** 0004

Violation of
18 U.S.C. § 371

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

SEAN THOMAS-MOORE, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

## COUNT ONE
### (Conspiracy to Violate the Foreign Corrupt Practices Act)

1.    From in or about January 2014 through in or about May 2015, in the Southern District of New York and elsewhere, ANDREW SIMON, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, to violate the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-2.

2.    It was a part and object of the conspiracy that ANDREW SIMON, the defendant, and others known and unknown, being a domestic concern, and aiding and abetting a domestic concern, would and did willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, and offer, gift, promise to give, and authorization of the giving of anything of

value to a foreign official, and to a person, while knowing that all and a portion of such money and thing of value would be and had been offered, given, and promised, directly and indirectly, to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in that foreign official's official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such foreign official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use that foreign official's influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government and instrumentalities, in order to assist SIMON and others in obtaining and retaining business for and with, and directing business to, SIMON and others.

### Overt Acts

3.     In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.     On or about March 7, 2014, co-conspirator Joo Hyun Bahn, a/k/a "Dennis Bahn" ("BAHN") placed a telephone call from Manhattan to a third-party intermediary, Malcolm Harris ("HARRIS"), to discuss the payment of bribes to a foreign official ("Foreign Official-1") of a country in the Middle East ("Country-1") in order to induce Foreign Official-1 to act in an official capacity by causing Country-1's sovereign wealth fund (the "Fund") to acquire a building complex in Hanoi, Vietnam, known as "Landmark 72," which was owned by BAHN's client, Keangnam Enterprises Co., Ltd. ("Keangnam").

b.     On or about March 7, 2014, BAHN sent an email to his father, co-conspirator Ban Ki Sang ("BAN"), which stated, in substance and in part, that Foreign Official-1 had demanded "bribes" in order to obtain Foreign Official-1's assistance in convincing the Fund to acquire Landmark 72.

c.     In or about April 2014, ANDREW SIMON, the defendant, met with BAHN and a cooperating witness not named as a defendant herein ("CW-1")[1] in Manhattan to discuss the payment

---

[1] In October 2017, CW-1 pleaded guilty, pursuant to a cooperation agreement with the Government, to conspiracy to violate the FCPA, see 18 U.S.C. § 371, and violation of the FCPA, see 15 U.S.C. § 78dd-2.  CW-1 is cooperating with the Government in the

of an upfront $500,000 bribe to Foreign Official-1 in
furtherance of concluding the Landmark 72 deal.  During the
meeting, SIMON, BAHN, and CW-1 discussed using the code word
"roses" to refer to the bribe payment.

       d.   On or about April 15, 2014, BAHN and BAN
caused a wire transfer in the amount of $410,000 to be sent from
Keangnam's bank account in South Korea to a bank account in
Manhattan.

       e.   On or about April 16, 2014, BAHN and BAN
caused a wire transfer in the amount of $90,000 to be sent from
Keangnam's bank account in South Korea to a bank account in
Manhattan.

       f.   On or about April 16, 2014, CW-1, with
SIMON's knowledge, helped BAHN obtain a $500,000 loan from a
businessman in New York (the "Businessman") in order to pay an
upfront bribe to Foreign Official-1, through HARRIS, to induce
Foreign Official-1 to act in an official capacity by causing the
Fund to acquire Landmark 72.

       g.   On or about April 16, 2014, SIMON sent an
email to CW-1 in which SIMON inquired about the status of the
"roses."  When CW-1 informed SIMON that the "roses" were
"wrapped" and "on the way," SIMON replied, "Great."

    (Title 18, United States Code, Section 371.)

    The bases for my knowledge and the foregoing charge are, in
part, as follows:

       4.   I am a Special Agent with the FBI and have been
so employed for approximately eight years.  I am currently
assigned to the International Corruption Squad of the New York
Division of the FBI, and have received training in foreign
bribery, kleptocracy, money laundering, fraud, and other white
collar crimes.  I am familiar with the facts and circumstances
set forth below from my personal participation in the
investigation, including my examination of reports and records,
interviews I have conducted, and conversations with other law
enforcement officers and other individuals.  Because this
affidavit is being submitted for the limited purpose of

hopes of receiving leniency at sentencing.  The information
provided by CW-1 has proven reliable and has been corroborated
by other evidence, including other witnesses.

establishing probable cause, it does not include all the facts
that I have learned during the course of my investigation.
Where the contents of documents and the actions, statements and
conversations of others are reported herein, they are reported
in substance and in part, unless noted otherwise.

## OVERVIEW

5.    As set forth in greater detail below, from in or
about January 2014 through in or about May 2015, ANDREW SIMON,
the defendant, participated in a corrupt scheme with BAHN, BAN,
CW-1 and others to pay approximately $2.5 million in bribes to
Foreign Official-1 in connection with Keangnam's attempted $800
million sale of Landmark 72 to the Fund.[2]

6.    In or about early 2013, Keangnam, the South
Korean construction company that built and owned Landmark 72,
was experiencing a liquidity crisis.  The debts owed to
Keangnam's creditors were maturing and the company needed to
raise capital.  BAN, who served as an executive at Keangnam,
arranged for his son, BAHN, who was a commercial real estate
broker in Manhattan, to broker the attempted refinancing, and
later sale, of Landmark 72 on behalf of Keangnam.  At the time,
BAHN and CW-1 worked together at a commercial real estate
brokerage firm in Manhattan ("Firm-1").

7.    In or about January 2014, ANDREW SIMON, the
defendant, recruited BAHN and CW-1 to work for a different
commercial real estate brokerage firm in Manhattan ("Firm-2")
where SIMON worked at the time.  While working together at Firm-
2, SIMON and CW-1 assisted BAHN with his efforts to sell
Landmark 72 on behalf of Keangnam.  Furthermore, SIMON, CW-1,
and Firm-2 stood to earn a portion of the multi-million-dollar
commission that BAHN expected to be paid if the Landmark 72 deal
succeeded.

8.    Instead of attempting to sell Landmark 72 through
legitimate means, BAHN, BAN, and CW-1, with the knowledge and
assistance of ANDREW SIMON, the defendant, agreed and attempted
to pay bribes to Foreign Official-1, through HARRIS in New York,
who claimed to have connections to Foreign Official-1.  BAHN,
BAN, CW-1, and SIMON intended for these bribes to induce Foreign
Official-1 to use his official influence to convince the Fund to

---

[2] As discussed below, see infra ¶ 28, Foreign Official-1 is a
real person, but had no knowledge of, and did not participate
in, the FCPA bribery scheme at issue in this case.

4

acquire Landmark 72 from Keangnam for approximately $800 million.

9.    In or about April 2014, BAHN and BAN agreed to pay, through HARRIS, a $500,000 upfront bribe to Foreign Official-1 on behalf of Keangnam.  BAHN and BAN further agreed to pay a $2,000,000 bribe to Foreign Official-1 upon the closing of the Landmark 72 transaction.  To conceal the criminal nature of the upfront $500,000 bribe, CW-1, with the knowledge of ANDREW SIMON, the defendant, helped BAHN secure a $500,000 loan from the Businessman, who was CW-1's real estate business partner in New York.  At the direction of BAHN and CW-1, the Businessman wrote a check from the bank account of the Businessman's business for $500,000 to a company controlled by HARRIS so that HARRIS, in turn, could pay the $500,000 bribe to Foreign Official-1.

10.    Unbeknownst to ANDREW SIMON, the defendant, or his co-conspirators, HARRIS did not have the claimed relationship with Foreign Official-1 and did not intend to pay the bribe money to Foreign Official-1.  Instead, HARRIS simply stole the $500,000 upfront bribe money, which HARRIS spent on lavish personal expenses.[3]

## RELEVANT PERSONS AND ENTITIES

10.    At all times relevant to this Complaint, ANDREW SIMON, the defendant, was a United States citizen and resident of New Jersey.  As such, SIMON was a "domestic concern" as that term is used in the FCPA, see 15 U.S.C. § 78dd-2(h)(1).  From my review of employment records for SIMON, I have learned that SIMON worked as a broker at Firm-2 at an office located in Manhattan between in or about December 2010 and May 2015, when SIMON resigned.

11.    From my review of immigration records, I have learned that at all times relevant to this Complaint, BAHN was a national of South Korea and a legal permanent resident of the United States.  As such, BAHN was a "domestic concern" as that term is used in the FCPA, see 15 U.S.C. § 78dd-2(h)(1).  From my review of employment records for BAHN, I have learned that BAHN worked as a broker at Firm-1 between in or about February 2013

---

[3] HARRIS pled guilty to wire fraud and money laundering charges in relation to this scheme on or about June 21, 2017, and was sentenced on or about October 4, 2017.

and March 2014, and at Firm-2 between in or about March 2014 and May 2015. BAHN is BAN's son.

12. From my review of records maintained in law enforcement databases, I have learned that at all times relevant to this Complaint, BAN was a national and resident of South Korea. At all times relevant to this Complaint, BAN was employed by, and served as a senior advisor to, Keangnam.

13. From my review of immigration records, I have learned that at all times relevant to this Complaint, CW-1 was a national of South Korea and a legal permanent resident of the United States. As such, CW-1 was a "domestic concern" as that term is used in the FCPA, see 15 U.S.C. § 78dd-2(h)(1). From my review of employment records for CW-1, I have learned that CW-1 worked as a broker at Firm-1 between in or about March 2013 and March 2014, and at Firm-2 between in or about March 2014 and May 2015.

14. From my review of records maintained in law enforcement databases, I have learned that at all times relevant to this Complaint, HARRIS was a United States citizen who resided in Manhattan and Brooklyn, New York.

15. From an interview I conducted of Foreign Official-1, I have learned that at all times relevant to this Complaint, Foreign Official-1 was an officer and employee of the government of Country-1, and a department, agency, and instrumentality thereof, and a person acting in an official capacity for and on behalf of such government, department, agency, and instrumentality. As such, Foreign Official-1 was a "foreign official" as that term is used in the FCPA, see 15 U.S.C. § 78dd-2(h)(2)(A).

16. From my interviews of employees of the Fund, I have learned that the Fund is a sovereign wealth fund controlled by the government of Country-1. At all times relevant to this Complaint, the Fund was an "instrumentality" of a foreign government as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2.

## BACKGROUND ON LANDMARK 72

17. From my interviews of witnesses and my review of various materials gathered in this investigation, including documents provided by Firm-1 and Firm-2 and emails obtained from email accounts used by BAHN, CW-1, HARRIS, and ANDREW SIMON, the

defendant, I have learned the following, in substance and in part:

a.   In or about 2012, Keangnam completed the construction of Landmark 72 in Hanoi, Vietnam.  Landmark 72 comprised a 72-story commercial office building and two 48-story residential buildings.  The construction of Landmark 72 cost more than $1 billion, which Keangnam financed, in part, through loans issued by South Korean banks.  At all times relevant to this Complaint, Keangnam owned Landmark 72.

b.   In or about early 2013, Keangnam was experiencing liquidity problems.  Faced with maturing debts owed to its creditors, including those incurred in the construction of Landmark 72, Keangnam sought to refinance or sell Landmark 72 to an investor for approximately $800 million.

c.   In or about February 2013, BAN arranged for Keangnam to retain his son, BAHN, to broker a refinancing of Landmark 72 on behalf of Keangnam.  At the time, BAHN and CW-1 worked together as real estate brokers at Firm-1 in Manhattan.  If BAHN successfully brokered the refinancing or sale of Landmark 72, he stood to earn a multi-million-dollar commission for himself and Firm-1.

17.   From my review of emails and text messages of BAHN and HARRIS, I have learned that in or about March 2013, BAHN was introduced to HARRIS through a mutual acquaintance in Manhattan.  BAHN and HARRIS began discussing potential business opportunities, including Landmark 72.  In emails and text messages sent to BAHN, HARRIS claimed he could assist BAHN with the refinancing or sale of Landmark 72 through HARRIS's personal connections, which HARRIS represented as including members of the royal family of Country-1.  In exchange for helping BAHN in securing an investor for Landmark 72, BAHN promised to pay HARRIS a "cut" of the multi-million-dollar commission that BAHN expected to earn from Keangnam upon the refinancing or sale of Landmark 72.

18.   From my review of employment records and emails of BAHN, CW-1, and ANDREW SIMON, the defendant, I have learned that in or about September 2013, BAHN enlisted the assistance of CW-1, who was working at Firm-1 with BAHN, in BAHN's efforts to secure an investor for Landmark 72.  In or about January 2014, BAHN and CW-1 were recruited by SIMON to work with him at Firm-2 in Manhattan.  When BAHN and CW-1 moved to Firm-2, they

continued to work together, along with SIMON, to try to broker the sale or refinancing of Landmark 72.

### The FCPA Bribery Scheme

19.  From my review of emails and text messages of BAHN and HARRIS, I have learned the following:

a.  On or about February 17, 2014, BAHN and HARRIS exchanged text messages concerning the Landmark 72 deal. In the text messages, HARRIS claimed that he was working with a new contact at the Fund, namely Foreign Official-1.  In the text messages, HARRIS told BAHN that Foreign Official-1 was in a position to influence the Fund's decision to acquire Landmark 72, but that Foreign Official-1 would require an "upfront payment" made to him personally in order to do so.  The text messages stated, in part:

| | |
|---|---|
| HARRIS: | I've been working with my new . . . contact [in Country-1] for the past few days . . . and between us . . . these guys are all alike . . . at least [HARRIS's former purported contact in Country-1] was a little more subtle with his "pay-for-play" approach . . . the new guy that's been assigned to the "calendar" has pretty much spelled it out . . . that these slots have a price . . . . |
| BAHN: | Hi Malcolm.  Thanks for the feedback.  Please tell him there is a $13,000,000 fee we can collect if this deal closes with [the Fund] and we are happy to share the fee with him as long as he gets us in front of the [Head of State of Country-1] and help us get his approval. |
| HARRIS: | I've been pushing this angle . . . trying not to get too frustrated with this new guy as he truly is holding all of the cards . . . I'm possibly splitting an |

> appointment "gift" (is what they
> call it) with another client . . .
> to get the ball rolling on their
> project . . . .

BAHN:               Ok . . . . Whatever works we will
                    accommodate. If some sort of
                    upfront payment is needed to
                    secure a meeting with the [Head of
                    State of Country-1] and his
                    approval please ask him and let me
                    know and I will ask my client how
                    much we can spend on your new
                    contact.

      b.   On or about February 25, 2014, HARRIS and
BAHN exchanged text messages about payments for Foreign
Official-1. HARRIS told BAHN that the code word for the
payments to Foreign Official-1 was "roses." BAHN assured HARRIS
that Keangnam would "accommodate" the payments in order to close
the Landmark 72 deal.

      20.   From my review of emails of BAHN and HARRIS, I
have learned the following:

      a.   On or about March 7, 2014, HARRIS forwarded
to BAHN an email purportedly from Foreign Official-1, which
stated that Foreign Official-1 would require an upfront payment
of $250,000 and a payment of $750,000 after the Landmark 72 deal
was approved by the Fund. Later that day, BAHN forwarded the
purported email from Foreign Official-1 to his father, BAN.
Above the forwarded email, BAHN wrote that Foreign Official-1
could assist Keangnam with the Landmark 72 deal, but that
Keangnam would have to pay "bribes" to obtain such assistance.[4]

      b.   On or about March 17, 2014, BAHN forwarded
an email purportedly sent by Foreign Official-1 to BAN. The
forwarded email proposed that the Fund acquire Landmark 72 for
$700 million. The purported email from Foreign Official-1
further stated: "Once [the] requested roses are received I will
push this deal for approval." Above the forwarded email, BAHN

---

[4] Certain of the emails exchanged between and among BAHN, BAN,
CW-1, and Keangnam employees are in the Korean language. To the
extent such emails are quoted or paraphrased in this Complaint,
the quotations and paraphrases are preliminary draft English
translations of the original Korean.

wrote that in order for the deal with the Fund to proceed, a
"down payment" from Keangnam was required.  BAHN told BAN that
Keangnam either had to pay the bribes to Foreign Official-1 "or
forget about the whole thing."

              c.   On or about April 1, 2014, BAHN sent an
email to HARRIS, which stated that BAHN "had a very long
conversation with Keangnam regarding Landmark 72" the night
before and that Keangnam's creditors were "not happy" with the
$700 million offer from the Fund.  BAHN told HARRIS that if the
Fund increased the purchase price to $800 million, Keangnam
would be willing to increase the upfront payment to Foreign
Official-1 from $250,000 to $500,000 and pay $2,000,000 to
Foreign Official-1 after the deal closed.

              d.   On or about April 3, 2014, BAHN sent an
email to HARRIS stating that BAHN had received "approval" from
Keangnam for the proposed $800 million offer for Landmark 72 and
the "$500,000 upfront" and "$2,000,000 after closing" bribe
payments for Foreign Official-1.  BAHN explained to HARRIS that
the funds used to pay the bribe to Foreign Official-1 would,
however, have to be disguised as a legitimate payment from
Keangnam.

       21.   From my review of BAHN's emails and documents
provided by Firm-2, I have learned that around the time that
BAHN and BAN were negotiating the bribe payments for Foreign
Official-1, BAHN caused Keangnam and Firm-2 to enter into a
written agreement (the "Brokerage Agreement"), pursuant to which
Firm-2 agreed to broker the sale of Landmark 72 in exchange for
a percentage of the sale price.  Pursuant to the Brokerage
Agreement, Keangnam agreed to pay an advance "deposit" of
$500,000 to Firm-2, which was to be held in escrow and credited
against Firm-2's future commission upon the sale of Landmark 72.

       22.   From speaking with CW-1, I have learned, in
substance and in part, that in or about April 2014, ANDREW
SIMON, the defendant, BAHN, and CW-1 had a meeting in SIMON's
Manhattan office at Firm-2 during which they discussed the
payment of the initial $500,000 bribe to Foreign Official-1 in
furtherance of the Landmark 72 deal.  BAHN told SIMON and CW-1
that the code word for the bribe payment was "roses."  CW-1
stated that both SIMON and CW-1 would be paid a portion of the
commission that BAHN stood to earn if the Landmark 72 deal
closed.

23.  From my review of emails of ANDREW SIMON, the
defendant, BAHN, and CW-1; documents and other information
provided by Firm-2; bank records; and my conversations with CW-
1, I have learned the following:

a.  On or about April 15 and 16, 2014, BAHN and
BAN caused Keangnam to send two wire transfers in the amounts of
$410,000 and $90,000, respectively, from Keangnam's bank account
in South Korea to Firm-2's bank account in Manhattan.

b.  On or about April 15, 2014, BAHN sent an
email to SIMON and CW-1 with the subject line: "Landmark 72 –
Wire Confirmation."  The body of the email stated: "FYI.
$90,000 to follow by tomorrow."  Attached to the email was a
wire confirmation showing that Keangnam had transferred $410,000
to Firm-2's Manhattan bank account.

c.  On or about April 16, 2014, at the direction
of BAHN and CW-1, and with SIMON's knowledge, the Businessman
wrote a check from the Businessman's bank account for $500,000
to "Muse Creative Consulting, LLC," a company controlled by
HARRIS.  BAHN caused the check to be delivered to HARRIS.  The
check was subsequently deposited into HARRIS's bank account in
Manhattan and cleared through a bank in Virginia.

d.  On or about April 16, 2014, SIMON sent an
email to CW-1 in which SIMON asked, "How were the roses?," which
I believe is a reference to the bribe payment to Foreign
Official-1.  Later the same day, CW-1 responded to SIMON and
BAHN, "All wrapped and it is on the way.  It was a good day
today."  SIMON then replied, "Great."

24.  From my review of emails of ANDREW SIMON, the
defendant, BAHN, and CW-1, I have learned that between in or
about May 2014 through in or about May 2015, BAHN sent SIMON and
CW-1 emails to keep them apprised of the purported status of the
Landmark 72 deal with the Fund.  Some of these emails referenced
the upfront $500,000 bribe payment that SIMON, BAHN, and CW-1
attempted to arrange for Foreign Official-1.  For example, on or
about May 7, 2014, BAHN forwarded an email to SIMON and CW-1
that BAHN had purportedly received from Foreign Official-1
concerning the status of the Fund's acquisition of Landmark 72.
The forwarded email from Foreign Official-1 stated, in part:

Rest assured, these are just formalities as
high level decision has been already made in
large part due to the generosity your client

11

has offered to us as well as the strength of
the deal. . . .  In return for the kind
gesture, we are very confident that we will
have a signed contract no later than June
30th.

25. From my review of emails of ANDREW SIMON, the
defendant, BAHN, and CW-1, and documents and information
provided by Firm-2 and CW-1, I have learned that in or about
September 2014, BAHN, with SIMON's knowledge, arranged for
Keangnam to enter into a side agreement with Galaxy Realty
Capital, Inc. ("Galaxy"), which is a company controlled by CW-1
(the "Galaxy Brokerage Agreement").  Pursuant to the Galaxy
Brokerage Agreement, Keangnam agreed to pay Galaxy a commission
of 1.1125% of the sale price of Landmark 72.  Around the same
time of the Galaxy Brokerage Agreement, BAHN, with SIMON's
knowledge, arranged for Firm-2 to enter into an Addendum to the
Brokerage Agreement between Firm-2 and Keangnam, which reduced
Firm-2's commission from 2.0% to 0.7% of the Landmark 72 sale
price.

26. From my review of emails of ANDREW SIMON, the
defendant, BAHN, and CW-1, and documents and information
provided by Firm-2 and CW-1, I have learned that on or about
December 11, 2014, BAHN sent an email to CW-1 with the subject
"Vietnam Fee," which is a reference to the anticipated
commission for the Landmark 72 deal.  Attached to the email was
a one-page document containing a chart that is a breakdown of
the percentages and payments to be made to various individuals
upon the closing of the Landmark 72 deal.  Specifically, the
chart shows that of the approximately $5.6 million commission
that was to be paid to Firm-2, SIMON would earn approximately
$336,000.  The chart also shows that of the approximately $8.9
million commission that was to be paid to Galaxy pursuant to the
Galaxy Brokerage Fee Agreement, the following approximate
amounts would be paid to the following individuals: (a) $3.27
million to BAHN; (b) $1.09 million to CW-1; (c) $1.54 million to
HARRIS; (d) $2.0 million to Foreign Official-1; and (e) $1.0
million to the Businessman.  Based upon this email, I believe
that SIMON, BAHN, and CW-1 intended to use the Galaxy commission
to, among other things, pay the "after-closing" bribe of $2
million to Foreign Official-1 and to repay the $500,000 loan
(plus $500,000 in interest) to the Businessman.

27. From my review of emails of ANDREW SIMON, the
defendant, BAHN, and CW-1, and documents and information
provided by Firm-2 and CW-1, I have learned that on or about

December 30, 2014, SIMON sent an email to BAHN, copying CW-1, concerning a request from executives of Firm-2 for information concerning the Landmark 72 deal and the potential fee Firm-2 would earn. SIMON's email appears to be a response to an earlier email chain among SIMON, BAHN, and CW-1 concerning the purported status of the Landmark 72 deal. In the email, SIMON stated: "I see references in this email chain to the Galaxy fee so I am not sure if I can forward this to them [the Firm-2 executives] unless it is edited." Based upon this email, I believe that SIMON was concerned about disclosing to the Firm-2 executives the secret fee agreement between Galaxy and Keangnam.

28. From interviews that I conducted of Foreign Offical-1 and employees of the Fund, I have learned that the Fund never intended to acquire Landmark 72 and that Foreign Official-1 never agreed to accept any bribes or facilitate the Fund's acquisition of Landmark 72. Indeed, Foreign Official-1 stated that he never met or communicated with HARRIS, BAHN, BAN, or anyone else at Keangnam, and was not familiar with Landmark 72. Furthermore, from my review of HARRIS's emails and bank records for HARRIS's company, Muse Creative Consulting, LLC, I have learned that HARRIS spent the intended $500,000 bribe money on lavish personal expenses, including rent for a luxury penthouse apartment in Williamsburg, Brooklyn. Additionally, in connection with his guilty plea, HARRIS admitted that he had falsely represented his relationship with Foreign Official-1 to BAHN.

29. From my review of BAHN's emails and publicly available records, I have learned that in or about early 2015, after Keangnam failed to sell Landmark 72 and was unable to repay its creditors, Keangnam was forced to enter court receivership in South Korea.

13

## CONCLUSION

WHEREFORE, deponent prays that an arrest warrant be issued for ANDREW SIMON, the defendant, and that he be imprisoned or bailed, as the case may be.

SEAN THOMAS-MOORE
Special Agent
Federal Bureau of Investigation

Sworn to before me this
17th day of October 2017

HONORABLE SARAH NETBURN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

14